## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| TRIAD CAPITAL MANAGEMENT, LLC and AU PUBLISHING HOLDINGS, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | No. 07 C 3641 |
| v. | ) ) | Judge Joan B. Gottschall |
| PRIVATE EQUITY CAPITAL CORPORATION and JOHN M. RAMEY, | ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION & ORDER

Plaintiffs Triad Capital Management, LLC ("Triad") and AU Publishing Holdings, LLC ("AU") brought a four-count complaint against defendants Private Equity Capital Corporation ("PECC") and John M. Ramey ("Ramey"), asserting contractual, quasi-contractual, and fraud claims arising from the failed acquisition of Author Solutions, Inc. ("Author Solutions"[1]), an Indiana-based publishing company. According to plaintiffs' First Amended Complaint, PECC committed to but failed to provide funding for the Author Solutions acquisition, a deal that allegedly was to close before the end of 2006. This case presently comes before the court on defendants' motion for summary judgment.

### I.  PLAINTIFFS' MOTION TO STRIKE

Before addressing the factual background of this case and analyzing the merits of defendants' motion, the court first resolves a motion to strike filed by the plaintiffs. Plaintiffs have moved to strike certain statements in defendants' response to plaintiffs'

---

[1]  The parties also refer to Author Solutions as "AuthorSolutions" and "AuthorHouse." The court refers to the entity as Author Solutions, except where quoting the parties or the evidence submitted.

additional proffered facts (Doc. 104); defendants' responses at issue seek to strike plaintiffs' additional facts. To resolve this dispute, the court first considers whether, as defendants contend, plaintiffs' additional facts should be stricken, then whether, as plaintiffs contend, defendants' requests to strike should themselves be stricken.

Defendants seek to strike certain of plaintiffs' additional facts on two grounds. First, defendants assert that certain of plaintiffs' additional facts should be stricken as not "short" within the meaning of Local Rule 56.1(a). Having reviewed the statements of additional fact indicated by defendants, the court concludes that defendants are correct that many of plaintiffs' statements of fact are not strictly "short," but also that the statements are also not so long as to require striking.

Defendants also seek to strike certain statements of additional fact based on what they believe to be contradictions between, on the one hand, plaintiffs' interrogatory responses and an affidavit from James Crawford, the principal of Triad, and, on the other hand, Crawford's deposition testimony. Defendants are correct that interrogatory responses and affidavits can provide an evidentiary basis to avoid summary judgment, *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), only insofar as they do not contradict sworn deposition testimony from the party that responded to the interrogatories or submitted the affidavit, *LaFary v. Rogers Group, Inc.*, 591 F.3d 903, 908 (7th Cir. 2010). However, having reviewed the cited parts of the responses, Crawford's affidavit, and his testimony, the court finds that the affidavit and interrogatory responses are at least arguably consistent with the deposition testimony. Given the court's duty to draw reasonable inferences in the non-moving party's favor, arguable consistency is sufficient

at this stage, and the court declines to grant defendants' request to strike the interrogatory responses, Crawford's affidavit, or the statements of additional fact that each supports.

Defendants' arguments regarding deficiencies in plaintiffs' statement of additional facts and plaintiffs' underlying evidence are rejected but are not so poorly taken as to require striking. Thus, plaintiffs' motion to strike is also denied.

## II.  FACTUAL BACKGROUND

### A.  Triad Attempts to Acquire Author Solutions

James Crawford formed Triad in 2006 and, as Triad's first deal, pursued the acquisition of Author Solutions. (Defs.' Stmt. ¶ 11.)[2] Crawford also formed plaintiff AU as a shell entity by which Triad would purchase Author Solutions. (*Id.* ¶ 12.) On September 20, 2006, Triad, Author Solutions, and the owner of Author Solutions ("Gazelle") entered into an agreement giving Triad the exclusive right to acquire Author Solutions until October 27, 2006. (*Id.* ¶¶ 16-18.) When that exclusivity period elapsed, Triad had not yet secured sufficient funding to complete its acquisition of Author Solutions. (*Id.* ¶ 20.) Triad secured a second exclusivity period, which expired on November 3, 2006, again without consummation of the deal. (*Id.* ¶¶ 21-22.) After the expiration of the second exclusivity period, Triad, Gazelle, and Author Solutions continued negotiations regarding the acquisition without an exclusivity provision but with an understanding that the deal would close before the end of the calendar year. (*Id.* ¶ 23.)

---

[2]  Citations to the record proceed as follows. "Defs.' Stmt." refers to Defendants' Local Rule 56.1(a)(3) Statement of Undisputed Material Facts. "Defs.' Ex." refers to Defendants' exhibits in support of their statement of facts. "Pls.' Stmt." refers to Plaintiffs' Local Rule 56.1(b)(3)(C) Statement of Additional Material Facts that Require the Denial of Summary Judgment. "Pls.' Ex." refers to Plaintiffs' exhibits in support of their statement of additional facts.

**B.     Bertram**

In late November, Triad found a firm named Bertram Capital ("Bertram"), which was willing and able to fund the deal. (Defs.' Stmt. ¶ 26.) Bertram proposed to contribute the majority of the equity and debt necessary to complete the transaction, with Triad contributing the remainder. (Defs.' Ex. I.) Bertram, Triad, Gazelle, and Author Solutions progressed toward a year-end closing, including due diligence at Author Solutions' facility in Indiana on December 18 and 19, 2006. (Defs.' Stmt. ¶ 30.) According to both Bertram and Author Solutions, as of December 19, the parties were moving toward closing the deal. (*Id.* ¶¶ 31-32.)

**C.     PECC and Ramey**

At the same time, Triad attempted to pursue the Author Solutions acquisition with PECC in lieu of Bertram. On December 13, 2006, Crawford, on behalf of Triad, first made contact with Ramey, the principal of PECC, regarding the acquisition. (*Id.* ¶¶ 33, 36, 37.) After speaking to Ramey on the telephone, Crawford emailed Ramey an investment memorandum regarding Author Solutions. (*Id.* ¶¶ 37-38.) In the email, Crawford stated, "While the Dec 31 target might be impossible if you decided you wanted to be TRIAD's financial partner in the deal, we could extend into January if we could show [Gazelle] that we are making good progress." (Defs.' Ex. D.)

Crawford and Ramey met for the first time on December 20, 2006, in the Milwaukee airport. (Defs.' Stmt. ¶ 40.) Although Ramey and Crawford discussed that there was a "tremendous amount of work to be done" (Defs.' Ex. B, 116:4-13), Crawford understood from his conversation with Ramey that in "the time that we had available to do the deal [Ramey] could get it done" (Defs.' Ex. A, 152:16-19). Also on December 20,

2006, after Crawford and Ramey's meeting, Triad's accountants sent Ramey and his assistant due diligence reports regarding Author Solutions. (Defs.' Stmt. ¶ 43.)

On December 21, 2006, Crawford notified Ramey that Bertram was ready to continue with the acquisition, and, "If [Triad and PECC] are to work together, we need to take some action, perhaps as early as today." (*Id.* ¶¶ 44-45.) A conversation with Ramey later that day left Crawford with the impression that the "economics" of the acquisition were better for Triad with PECC than with Bertram (*id.* ¶ 46), and that Triad could assure Author Solutions that it had funding besides Bertram (*id.* ¶ 47). On December 21, after their conversation, Ramey emailed Crawford, stating, "We will say we will close by december [*sic*] 31 . . . ." (Defs.' Ex. O.) Ramey testified that Crawford knew that the acquisition was not going to close before the end of 2006 (Defs.' Stmt. ¶ 55), but Crawford testified that Ramey left him with the impression that the deal could close by December 31 (Defs.' Ex. 2, at 168:23 through 169:11). However, on December 22, Ramey emailed Crawford, stating that "we will not close this deal on december [*sic*] 31 as you know." (Defs.' Ex. Q.)

Also on December 21, Crawford emailed Ramey that Author Solutions had requested a letter "committing to the deal and the timing." (Pls.' Ex. 8.) Crawford attached to the email a term sheet for the parties' investment in and management of AU, the entity that Triad had planned to use to make the investment, and terms based on "[m]y understanding of our discussion . . . ." (*Id.*) These terms included a transaction fee for Triad and a possible transaction fee for PECC, an annual management fee for Triad, and additional terms applicable to Triad's and PECC's investors. (*Id.*) Crawford

concluded the email by asking, "Do I have this understanding correct?" (*Id.*) The next day, Ramey responded "Yes that is fine." (Pls.' Ex. 5 Ex. A.)

## D. The PECC Letter

On December 22, Crawford drafted the letter from Ramey that Author Solutions requested, and edited the letter with Ramey. (Defs.' Stmt. ¶ 50; Pls.' Stmt. ¶ 19.) Crawford then sent the letter on Ramey's behalf to Author Solutions. (Pls.' Stmt. ¶ 19.) After a conversation with Ramey, Author Solutions returned the letter Crawford had forwarded, with a number of edits, including that: the letter was "binding" rather than non-binding; PECC "will," not "would expect to," "deliver cash at closing;" that closing "will be," rather than "is targeted for," December 29, 2006; and that, with respect to any bridge financing, "PECC will provide such financing if necessary." (Pls.' Stmt. ¶ 22). According to Ramey, this "fundamentally change[d] the characteristics of the [previous] draft." (Pls.' Ex. 1, at 180, 19-24.) Even so, Ramey emailed Author Solutions that "[Crawford] and I will do this." (Pls.' Stmt. ¶ 24.)

On December 23, 2006, with Author Solutions' revisions incorporated, Ramey signed the letter, which the parties refer to as the PECC letter, and faxed it to Crawford, who forwarded the letter to Author Solutions. (Pls.' Stmt. ¶ 28; Doc. 54 Ex. 1.)[3] The PECC Letter stated, in part:

> PECC is pleased to submit the following binding offer to team with TRIAD ("PECC-TRIAD [*sic*]) to purchase AuthorHouse. Our proposal is based upon our current understanding of the TRIAD due diligence that we have reviewed, as well as our current understanding of the deal structure that has been agreed to by [Author Solutions'] primary owners, Gazelle TechVentures ("Gazelle"). We require no further due diligence.

---

[3] Ramey and Crawford previously submitted the letter as signed by Crawford with Ramey's permission and in Ramey's name, but were asked by Author Solutions to submit a letter signed by Ramey. (Pls.' Stmt. ¶ 27.)

(Doc. 54 Ex. 1.)  The PECC letter contained a number of general terms regarding the Author Solutions acquisition, and specifically stated, "Closing will be December 29, 2006 with an effective date as of the close of business December 31, 2006 and is subject to the terms and conditions of the [Purchase Agreement]."  (*Id.*)  Later, the letter states, "Jim Crawford and I look forward to executing the [Purchase Agreement] today and moving toward our proposed closing date."  (*Id.*)  In testimony, Ramey admitted that he had no intention of closing by December 29, 2006.  (Pls.' Ex. 1, at 202:1-16.)

**E.     The Deal Does Not Close**

On December 26, 2006, PECC's attorney and Triad's attorney had a conference call to discuss the deal.  (Defs.' Stmt. ¶ 59.)  In the call, PECC's counsel stated that he did not think that the deal could close by December 31.  (*Id.* ¶ 61.)  Ramey thought the deal might close in mid-January, and that it did not need to close in December.  (Defs.' Exs. S & T.)  Still, on the evening of December 26, 2006, AU (Triad's vehicle for consummating the deal) and Author Solutions entered into a Stock Purchase Agreement, to which PECC was not a party.  (Defs.' Ex. U.)  The Stock Purchase Agreement extended Triad's exclusivity provision through December 31, 2006.  (Pls.' Stmt. ¶ 33.)

However, on December 27, Ramey informed Author Solutions in a telephone call that also included Crawford that the deal would not close on December 29.  (Pls.' Ex. 1, 236:2 through 237:19; Pls.' Stmt. ¶ 38.)

Still attempting to complete the deal, Crawford sent Ramey and PECC's counsel a "term sheet" on December 30 so that PECC and Triad could engage in further negotiations "with a common voice."  (Defs.' Ex. V.)  The Term Sheet was never signed by either party.  (Defs.' Stmt. ¶ 66)  Crawford testified that the parties negotiated and revised the terms in a conference call, as reflected in Crawford's notes on a revised Term

Sheet (Defs.' Ex. 2, 297:1 through 298:22; Pls.' Stmt. ¶ 6), but Ramey and PECC's counsel could not recall any conference call, let alone an agreement on the term sheet.

While Triad produces evidence that it had "arranged" to bring financing to a year-end closing (Pls.' Stmt. ¶ 9), neither Triad nor PECC produced the requisite financing by December 31, and Author Solutions and its owner Gazelle did not further extend the exclusivity period. (Defs.' Stmt. ¶¶ 64, 67.) Instead, on January 1, Author Solutions and Gazelle terminated Triad's exclusivity period (*id.* ¶ 69), and Bertram eventually completed the deal without Triad (*id.* ¶ 70).

### III.    LEGAL STANDARD

Summary judgment is warranted where "the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see also Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008). Normal burdens of proof remain, however. If plaintiffs have failed to establish a genuine issue of material fact regarding one of the elements of his case, then summary judgment will be entered in favor of the defendants. *See Beard v. Banks*, 548 U.S. 521, 529-30 (2006); *see also Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999).

### IV.    ANALYSIS

Defendants seek summary judgment on all four counts of Triad's Amended Complaint. The court addresses each count in turn. Because this court has jurisdiction over this case based on the parties' diversity, the substantive law of the forum state,

Illinois, applies. *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 677 (7th Cir. 2008).[4]

## A.     Breach of Contract

Plaintiffs bring their breach of contract claim only against PECC. (Doc. 54 at 5.) PECC moves for summary judgment on this count, contending that plaintiffs have failed to identify a contract between plaintiffs and PECC and that, even if an agreement can be identified, the contract does not have sufficiently specific terms to be enforceable. Plaintiffs respond that their contract with PECC was oral, and is evidenced by several documents, including the PECC letter, and that the parties' communications set forth the terms of the contract.

### 1.     Whether a Contract Existed

"The basic requirements of a contract are an offer, an acceptance, and consideration." *In re Marriage of Tabassum & Younis*, 881 N.E.2d 396, 406 (Ill. App. Ct. 2007). "In Illinois, '[t]he existence of a contract is generally a question of law for the court to resolve.'" *Bus. Sys. Eng'g v. Int'l Bus. Mach. Corp.* (*Business Systems*), 547 F.3d 882, 886-87 (7th Cir. 2008) (quoting *Arneson v. Bd. of Tr., McKendree Coll.*, 569 N.E.2d 252, 256 (Ill. App. Ct. 1991)). Questions of whether undisputed communications or documents constitute a contract are legal in nature. *Id.* at 887 n.2. However, when the facts giving rise to whether a contract exists are disputed, the resolution of those facts is left to the jury, and is not appropriate for resolution on summary judgment. *Id.* (citing *Hany v. Gen. Elec. Co.*, 581 N.E.2d 1213, 1217 (Ill. App. Ct. 1991)). Factual questions

---

[4]     The defendants assert in a footnote that they "reserve the right to raise [a] choice-of-law issue should the need arise at a later time in this litigation" (Doc. 75 at 16 n.3) but brief their motion under Illinois law. Given the general rule that the substantive law of the forum state applies in diversity cases, and absent an indication as to why another state's law would apply in this case, the court applies Illinois law to resolve defendants' motion.

include whether communications occurred, whether documents are authentic, and what the parties intended in making such communications or composing or executing such documents. *Id.* Thus, despite the general rule outlined above, an appellate court has stated, "The existence of a contract is a question reserved for the trier of fact, and this question becomes a question of law only if the facts are undisputed and reasonable men would agree as to the inferences drawn from them." *Commonwealth Edison Co. v. Industrial Comm'n*, 521 N.E.2d 159, 162 (Ill. App. Ct. 1988). With regard to oral contracts, the Seventh Circuit has noted that under Illinois law, "The existence of an oral contract, its terms, and the intent of the parties is a question of fact." *Podolosky v. Alma Energy Corp.*, 143 F.3d 364, 369 (7th Cir. 1998).

Plaintiffs maintain that their contract with PECC was oral and that they therefore "cannot point to a specific document that 'is' that contract." (Doc. 85 at 6.) Rather, they maintain that communications between Ramey and Crawford leading up to the PECC letter and thereafter resulted in a contract by which PECC committed to providing funds sufficient to close the Author Solutions acquisition by December 29, 2006. The Crawford-Ramey emails of December 21 and 22, coupled with the parties' December 21 telephone conversation, indicate that PECC and Triad agreed to a number of terms. (*See* Pls.' Ex. 8; Pls.' Ex. 5 Ex. A.) Their continued communications on December 22 and 23 prior to the execution of the PECC letter suggests that they continued to modify their agreement.

The parties' central factual dispute concerns whether, as part of the agreement, PECC committed to a year-end closing. While defendants point to Ramey's December 22 email stating that "we will not close this deal on december [*sic*] 31 as you know"

(Defs.' Ex. Q), plaintiffs maintain that, in the course of editing the PECC letter and sending it to Author Solutions, they reached an agreement that PECC was to provide such funding by the end of 2006. Based on the evidentiary record, after disclaiming a year-end closing on December 22, Ramey agreed to edit the PECC letter to change the December 29 closing date from targeted to agreed. Ramey acknowledged that, along with the other changes in the PECC letter, the change of the closing date presented a fundamental change in the wording of the letter. Plaintiffs produce an affidavit from Crawford averring that he and Ramey discussed the edits to the PECC letter and that he told Ramey that, by executing the edited PECC letter, Ramey was committing to a year-end closing. (Pls.' Ex. 5 ¶ 4.) Crawford also avers that Ramey agreed to the changes and signed the edited PECC letter. (*Id.*)

Defendants maintain that Crawford's admission in his deposition that Ramey never told him that the deal would close by year's end contradicts Crawford's affidavit, but it appears that Ramey manifested his agreement to close by year's end by his actions, not by words. *In re Marriage of Kloster*, 469 N.E.2d 381, 383 (Ill. App. Ct. 1984) ("[C]onduct indicating agreement with its terms is sufficient.") While PECC's commitment to Author Solutions arises from the plain wording of the PECC letter, its commitment to Triad arises from the letter and the surrounding Ramey-Crawford communications. Defendants dispute that Ramey intended to make such a commitment to Triad by executing the PECC letter, but his contemporaneous conversations with Crawford and the unambiguous statement in the PECC letter create at least a factual question regarding the nature of the commitment.

Defendants' reliance on *Business Systems*, 547 F.3d 882, is misplaced. In *Business Systems*, a subcontractor contended that it had not been paid the entire amount that the contractor had stated in its contract with the Chicago Transit Authority ("CTA") that it would pay the subcontractor. *Id.* at 885. The Seventh Circuit affirmed the entry of summary judgment against the subcontractor, finding that the subcontract, and not the contract with the CTA, was the agreement pursuant to which the contactor and the subcontractor acted, and that the subcontract did not set forth the specific dollar amount stated in the contract with the CTA. *Id.* at 887-88. Rather, the subcontract set forth that the subcontractor was to provide services, and receive payments for those services, only after receiving specific purchase orders, and did not set forth a specific dollar amount that the subcontractor was promised. *Id.* at 887. Because the subcontractor had been paid for the services it properly provided pursuant to purchase orders, the defendant had not breached the subcontract. *Id.* at 888.

Here, unlike in *Business Systems*, a genuine issue of fact concerns the existence of the parties' contract, and whether the parties' oral contract included the promise at issue– *i.e.*, that PECC would provide funding for closing before year's end. The communications giving rise to the asserted contract, and the inferences to be drawn from Ramey's execution of the PECC letter, create a factual question regarding whether, after Ramey initially declined to commit to a year's end closing, he agreed to such a commitment upon executing the PECC letter.

2.     Whether the Contract Had Sufficiently Definite Terms

PECC also argues that even if a material question of fact remains regarding whether a Triad-PECC contract existed, any such contract did not have sufficiently definite terms to be enforceable. *See Tower Inv., LLC v. 111 E. Chestnut Consultants,*

*Inc.*, 864 N.E.2d 927, 937 (Ill. App. Ct. 2007) (stating that the requirements for an enforceable contract include "definite and certain terms"); *see also Business Systems*, 547 F. 3d at 888 ("Business Systems has failed to identify any of the material terms of the alleged contract" other than the amount that the contractor allegedly agreed to pay it.). Here, plaintiffs have identified two documents that set forth specific terms to which Triad and PECC agreed. First, plaintiffs have identified a number of terms to which Ramey agreed in his December 22 response to Crawford's email setting forth terms of their "understanding." Second, the PECC letter contains a number of specific terms for the Author Solutions acquisition, including the closing date; as previously stated, issues of fact exist regarding whether, by executing the letter, PECC made identical promises to Triad. The central term at issue, the closing date of the deal, is specifically set forth in the PECC letter. Because these two documents set forth sufficiently definite terms, summary judgment is improper on plaintiffs' count I.

**B.      Breach of Contract – Third-Party Beneficiary**

Plaintiffs maintain in count II that they are third-party beneficiaries of the PECC letter which, they maintain, is a contract between PECC and Author Solutions. Defendants maintain that the plaintiffs are not direct third-party beneficiaries of such a contract.

As an initial matter, the PECC letter satisfies the basic requirements of a contract; Ramey's initial submission of the letter is an offer, Author Solutions' return of an edited letter constitutes a counter-offer, and Ramey's signature on that edited letter is an acceptance of that offer. *In re Marriage of Tabassum & Younis*, 881 N.E.2d at 406. Moreover, the PECC letter sets forth sufficiently specific terms to constitute a contract.

*Tower Inv., LLC*, 864 N.E.2d at 937.  The remaining question is whether plaintiffs are third-party beneficiaries of the PECC letter.

"In order to determine whether another is a third-party beneficiary, courts look to the contract to determine the intent of the parties." *F.H. Paschen/S.N. Neilsen, Inc. v. Burnham Station, L.L.C.*, 865 N.E.2d 228, 235 (Ill. App. Ct. 2007).  Third parties that derive only incidental benefits from a contract may not assert rights thereunder; rather, only direct beneficiaries have enforceable rights under a contract.  *Id.*  "[T]here is a strong presumption that parties to a contract intend that the contract's provisions apply to *only* them and not to third parties."  *155 Harbor Drive Condominium Ass'n v. Harbor Point Inc.*, 568 N.E.2d 365, 375 (Ill. App. Ct. 1991) (citation and quotation marks omitted) (emphasis in original).  To overcome that presumption, a contract must so strongly imply its application to a third party "as to be practically an express declaration." *Id.* (citation and quotation marks omitted).

Plaintiffs agree that they are not parties to the PECC letter; rather, they contend that they are third-party beneficiaries to the PECC letter, which refers to Triad numerous times throughout the PECC letter.  The letter states, in part, "PECC is pleased to submit the following binding offer to team with TRIAD ("PECC-TRIAD) to purchase AuthorHouse." (Doc. 54 Ex. 1.)  The letter mentions Triad several more times; in the letter, Ramey makes several representations on behalf of "PECC-TRIAD."  (*Id.*) Specifically, Ramey stated that "All equity financing required to close this transaction will be provided by the TRIAD and PECC investors."  (*Id.* at 2.)

Illinois courts have found third parties to be direct beneficiaries of contracts in circumstances similar to those presented here.  In *Paukowitz v. Imperial Homes, Inc.*, 649

N.E.2d 473 (Ill. App. Ct. 1995), the Illinois appellate court held that the purchaser of a home was the direct third-party beneficiary of the contract between the contractor and the contractor's supplier. *Id.* at 475-76. The court noted that it would be "inequitable" to deny that the purchaser was the third-party beneficiary when he was named in the supply contract, the contractor and supplier were both aware that the purchaser was going to own and occupy the home in question, and the supplier "negotiated extensively" with the purchaser of the home. *Id.* In *Peter J. Hartmann Co. v. Capital Bank & Trust Co.*, 694 N.E.2d 1108, 1118 (Ill. App. Ct. 1998), the court found that a landowner directly benefited from a contract between a contractor and subcontractor pertaining to environmental cleanup on the land in question, both because of the benefit to the land and because the landowner negotiated and signed the subcontract in question.

Here, the PECC letter identifies Triad at several points, and both PECC and Author Solutions were aware of Triad's participation in the acquisition, had negotiated extensively with Triad prior to the execution of the PECC letter, and communicated extensively with Triad concerning the PECC letter itself. Moreover, Triad would have benefitted directly from PECC's performance of its obligations under the PECC letter, namely, by acquisition of Author Solutions. While PECC denies that it intended to benefit Triad by executing the PECC letter, the language of the letter and the surrounding circumstances create at least a factual question as to the parties' intent in executing the PECC. Accordingly, defendants' motion is denied with respect to count II.

## C.    Promissory Estoppel

Defendants also move for summary judgment on plaintiffs' promissory estoppel claim. The Illinois appellate court has summarized the standard applicable to such claims as follows:

> Promissory estoppel is "an equitable device invoked to prevent a person from being injured by a change in position made in reasonable reliance on another's conduct." *Kulins v. Malco, a Microdot Company, Inc.,* 121 Ill.App.3d 520, 527, 76 Ill.Dec. 903, 459 N.E.2d 1038 (1984). To establish a claim based upon promissory estoppel, a plaintiff must allege and prove that "(1) defendants made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Quake Construction, Inc. v. American Airlines, Inc.,* 141 Ill.2d 281, 310, 152 Ill.Dec. 308, 565 N.E.2d 990 (1990). A plaintiff's reliance must be reasonable and justifiable. *Quake Construction, Inc.,* 141 Ill.2d at 310, 152 Ill.Dec. 308, 565 N.E.2d 990.

*Ross v. May Co.*, 880 N.E.2d 210, 217 (Ill. App. Ct. 2007).

Defendants assert that plaintiffs' promissory estoppel claim fails because PECC made no unambiguous promise to plaintiffs; according to defendants, any statements to plaintiffs regarding a closing date were nothing more than "expressions of optimism and determination." *Garwood Packaging, Inc. v. Allen & Co., Inc.* (*Garwood*), 378 F.3d 698, 704 (7th Cir. 1984) (affirming summary judgment on promissory estoppel claim). However, as noted above in regard to plaintiffs' breach of contract claim, factual issues exist regarding whether PECC promised Triad that it would fund the closing by the end of 2006. Taking the evidence in the light most favorable to Triad, PECC, by executing the PECC letter, promised that it would fund the acquisition before year's end. *See First Nat'l Bank of Cicero v. Sylvester*, 554 N.E.2d 1063, 1070 (Ill. App. Ct. 1990) (To support a claim for promissory estopppel, "An express promise is not required. Rather, the promise may be inferred from conduct and words." (citations omitted)). This promise

was sufficiently definite to support a triable breach of contract claim, and is sufficiently unambiguous to support a promissory estoppel claim as well. *Cf. Demos v. Nat'l Bank of Greece*, 567 N.E.2d 1083, 1088 (Ill. App. Ct. 1991) (finding that, when an "alleged oral contract is so indefinite as to be unenforceable, the doctrine of promissory estoppel, which the [plaintiffs] invoked . . . , is inapplicable as a matter of law.").

Defendants also argue that plaintiffs' promissory estoppel claim fails because their asserted reliance on any promise by PECC is unjustifiable and unreasonable as a matter of law. As explained within, whether reliance is justifiable in the context of a fraud claim is generally a question for the trier of fact, *see, e.g.*, *Johnson v. Waterfront Servs. Co.*, 909 N.E.2d 342, 348-49 (Ill. App. Ct. 2009), and the analogous element in a promissory estoppel claim is likewise factual, *accord First Nat'l Bank of Cicero*, 554 N.E.2d at 1070 (noting that each element of a promissory estoppel claim "presents a question for the trier of fact"). Defendants rely principally on *Garwood*, 378 F.3d 698, in which the Seventh Circuit affirmed summary judgment on a promissory estoppel claim in which the plaintiff produced evidence that it relied on the defendant's representation that a deal would close "come hell or high water." In *Garwood*, the Seventh Circuit found relevant that the closing of the deal, which concerned the manufacture of machines for the plaintiff, depended not just on the defendant's conduct but on two "sticking points" to the deal, both of which were demands by non-parties to the ensuing litigation. *Id.* at 701, 704. The defendant could not control either of the non-parties' demands, and so could not ensure that the deal would close, which was the subject of his "hell or high water" representation. Because defendant lacked this control, the plaintiff's reliance on the defendant's representation was unreasonable as a matter of law. *Id.* at 704.

Here, plaintiffs assert not only that the closing would go forward by the end of 2006, but also that PECC would deliver the necessary funding for the closing. Regardless of whether PECC's representation that the deal would close by the end of 2006 may have concerned matters outside PECC's control, its commitment to deliver the necessary funding for the closing was a representation concerning matters within its control. Even if, as defendants assert, Crawford was experienced in the private equity world and therefore should not have relied on a representation regarding the closing date, the court cannot conclude, based on the present record, that his experience made any reliance on PECC's promise to deliver funding for the closing unreasonable as a matter of law.

Finally, Defendants also argue that, regardless of whether PECC made a promise to plaintiffs that it would fund a closing before year's end, any reliance on such a promise was unreasonable as a matter of law in light of Ramey's other statements that the deal would not close by year's end. Specifically, on December 22, 2006, Ramey stated that "we will not close this deal on december 31 as you know." (Defs.' Ex. Q.) After initially declining to commit to a year's-end closing, however, Ramey agreed to sign the PECC letter. In the letter, Ramey affirmatively represented that PECC would fund a closing by the end of 2006. As previously stated, a factual issue exists regarding whether Ramey, by executing the letter, made a similar representation to Triad.

On December 26, Ramey stated in an email that "I am thinking we close about jan 14," (Defs.' Ex. S), then, in a later email, "The deal does not need to close in december. We will close mid to late january." (Defs.' Ex. T.) In the December 26 email, Ramey again represented that the deal would close in January. Viewed in the light most

favorable to plaintiffs, however, the available evidence suggests that Ramey, on behalf of PECC, hoped to extend the closing date into January but, in any case, had already promised a December closing date. Given PECC's prior commitment to fund an earlier closing, the court cannot conclude on the present record that, as a matter of law, plaintiffs' reliance on PECC's promise was unreasonable. Accordingly, defendants' motion for summary judgment is denied with respect to count III.

**D.     Fraud**

Finally, defendants move for summary judgment on plaintiffs' fraud claim which, unlike their three previous claims, is stated not only against PECC, but also against Ramey individually. The Illinois appellate court has summarized fraudulent misrepresentation claims as follows:

> In order to establish a cause of action for fraud, plaintiffs must allege and prove that the defendants: (1) made a false statement of material fact; (2) that defendants knew or believed it to be false; (3) that defendant made said statement with the intent to induce action by another in reliance on the statement; (4) that there was an action by the other in reliance on the truthfulness of the statement; and (5) that there was injury to the other resulting from that reliance. A statement of material fact is one upon which the plaintiff could reasonably rely in determining whether or not to act. . . . Whether or not a party has reasonably relied on a statement is a question for the trier of fact.

*Jeffrey M. Goldberg & Assocs., Ltd. v. Collins Tuttle & Co., Inc.*, 637 N.E.2d 1103, 1108 (Ill. App. Ct. 1994) (citation omitted).

Defendants first argue that they are entitled to summary judgment on plaintiffs' fraud claim because any reliance by plaintiffs on defendants' asserted misrepresentations was unreasonable as a matter of law. Defendants cite no particularly relevant legal authority, relying, in part, on *Association Benefit Services, Inc. v. Caremark Rx, Inc.* (*Caremark*), 493 F.3d 841, 853 (7th Cir. 2009). However, *Caremark* did not address the

reasonableness of the plaintiff's reliance. Rather, in *Caremark*, the parties disputed whether the defendant engaged in the requisite "scheme" to defraud the plaintiff in light of the bar under Illinois law on promissory fraud claims arising from a single, broken promise. *Id.* The court did not reach the issue of whether a scheme existed, finding that summary judgment in defendants' favor was proper because they had no intent to defraud plaintiffs at the time of their alleged misrepresentations, and because plaintiffs failed to present clear and convincing evidence of fraud. *Id.*

In their motion for summary judgment, defendants do not argue that plaintiffs' fraud claim is unsupported by evidence of a scheme; nor do they contest that they intended to defraud plaintiffs, or that plaintiffs' evidence meets the heightened burden for fraud. Rather, defendants argue that any reliance by plaintiffs was unreasonable as a matter of law. As noted above, Illinois courts generally consider the reasonableness of reliance in fraud claims to be a question for the trier of fact. *Jeffrey M. Goldberg & Assocs.*, 637 N.E.2d at 1108. As discussed with respect to plaintiffs' promissory estoppel claim above, this case presents material questions of fact regarding the reasonableness of plaintiffs' reliance.

Defendants also argue that Ramey cannot be held liable for the fraud that plaintiffs allege because their allegations do not support veil-piercing or an *alter ego* theory. This argument is poorly taken: plaintiffs seek to hold Ramey liable not derivatively, but directly, because he made the alleged misrepresentation. Veil-piercing and *alter ego* theories are a means of holding a principal of a company derivatively liable for the debts of a company, thereby disregarding the corporate form. *In re Rehabilitation of Centaur Ins. Co.*, 606 N.E.2d 291, 295-96 (Ill. App. Ct. 1992). Thus, for example, if

PECC owned land and its use of the land caused pollution to which the greater population was exposed, Ramey would not need to answer for PECC's resulting liability unless Ramey undercapitalized PECC, failed to observe corporate formalities, or engaged in other conduct indicating that PECC was nothing more than a façade. *See People v. V & M Indus., Inc.*, 700 N.E.2d 746, 750-51 (Ill. App. Ct. 1998).

However, the general rule against imputing a corporation's liabilities to its principals has no bearing on whether a principal is directly liable for torts that he commits within the scope of his agency relationship with the corporation. As the Seventh Circuit has held, Illinois law imposes liability on an individual tortfeasor for the torts he commits regardless of whether he acted on behalf of his employer. *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 765 (7th Cir. 2009); *see also Nat'l Acceptance Co. v. Pintura Corp.*, 418 N.E.2d 1114, 1117 (Ill. App. Ct. 1981) ("[A]lthough the officer is not liable for the corporation's torts simply by virtue of his office, corporate officer status does not insulate him from individual liability for the torts of the corporation in which he actively participates."). Rather than affecting the individual's liability, the question of whether the individual acted in his employment capacity affects the employer's liability. *Schur*, 577 F.3d at 765.

In this case, plaintiffs seek to hold Ramey liable for fraud based on alleged misrepresentations that he made as a corporate officer of PECC. If Ramey made the representations alleged by plaintiffs, he cannot avoid liability by asserting that he did so on behalf of PECC. Accordingly, defendants' motion for summary judgment is denied with respect to count IV.

### V.   CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is denied.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: July 29, 2010